IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MONTGOMERY COUNTY, MD** | * | |
| | * | |
| Appellant | * | |
| | * | |
| v. | * | Civil No. **PJM 09-567** |
| | * | |
| **BARWOOD, INC., et al.,** | * | |
| | * | |
| Appellees | * | |

**OPINION**

This is an appeal by Montgomery County, Maryland from an Order of the Bankruptcy Court, confirming the Reorganization Plan ("Plan") submitted by Debtors Barwood, Inc., Blue Star Group, Inc., Checker Transportation Company, Inc., City Lease, Inc., Fleet Tech, Inc., and Silver Spring Transportation Company (collectively "Barwood"). The issue on appeal is whether the Bankruptcy Court properly determined that § 1123(a) of the Bankruptcy Code preempts Montgomery County Code ("MCC") § 53-204(d). For the reasons that follow, the Court holds that the Montgomery County Code is not preempted and the decision of the Bankruptcy Court is therefore **REVERSED**.

**I.**

As do many states and local governments throughout the country, Montgomery County ("the County") regulates its taxicab industry. Its regulations are codified in Chapter 53 of the Montgomery County Code. Pursuant to these regulations, all taxicab drivers who operate within the County are required to have a County-issued personal vehicle license ("PVL"). MCC §53-201. Individual taxi drivers are required to hold an "Individual PVL," which authorizes the operation of a single taxicab and imposes a number of duties on the individual driver. MCC §§ 53-217 through 53-219. An entity that holds five or more PVLs meets the definition of a "fleet"

1

and must hold a "Fleet PVL."  MCC §§ 53-220 through 53-223.  In order to obtain a PVL, an individual taxi driver must comply with all of the requirements contained in Chapter 53, including carrying minimum liability insurance and maintaining a vehicle less than seven model years old that is in "clean and safe operating condition."  To obtain a Fleet PVL, the fleet entity must not only meet the requirements for Individual PVLs; it must also, among other things, submit a customer service plan, provide an adequate number of taxicabs to meet service demands 24 hours a day 7 days a week, and meet the requirements regarding the provision of accessible taxicabs. PVLs are subject to revocation for failure to meet the regulatory requirements.  PVLs are valid for one year and may be renewed for a second one-year period.  Of the total available PVLs in the County, approximately 80% are held by fleets and 20% by individual drivers.

Since 1964 – operating under a Fleet PVL — Barwood has provided taxi services in the County and throughout the Washington, D.C. area.  Together with its affiliates, it constitutes the largest taxicab company in the County.  As one of four companies operating in the County, Barwood and its affiliates hold 360 out of 715 County-issued PVLs.

At some time prior to 2007, a $3 million personal injury judgment was entered against Barwood as a result of an accident involving one of its taxicabs.  Because Barwood is self-insured, the judgment severely challenged its reserves, leading to its decision to file a petition under Chapter 11 of the Bankruptcy Code, resulting in a Reorganization Plan.  To satisfy its creditors, a crucial component of Barwood's Plan involved the sale or transfer of up to 250 of its Fleet PVLs to individual drivers.  Prior to October 2008, the Montgomery County Code contained a provision that prohibited the transfer of more than two Fleet PVLs to individuals per calendar year, but during the pendency of Barwood's bankruptcy proceedings, the County amended the County Code with respect to this provision.  Amended MCC § 53-204(d) now provides:

2

> The Director [of Transportation] must not approve the transfer to an individual of a license issued to a fleet if: (1) the same fleet has already transferred more than 2 licenses to individuals during that calendar year; or (2) the transfer would result in individuals holding more than 30% of the total number of licenses then in effect.
>
> Until December 31, 2009, the Director, after receiving a written request for a license, may waive either limit in this subsection on transferring a license issued to a fleet when the Director concludes that a waiver is necessary to avert a potential significant loss of service or to preserve or promote adequate taxicab service in all areas of the county, and the waiver will not reduce or impair competition, public welfare, and public safety. If the Director waives either limit for a fleet, the Director must at the same time waive the same limit for each other fleet so that each fleet's share of the waivers approved for all fleets is at least the same as that fleet's share of all fleet licenses when the application for a waiver was filed. The Director may attach reasonable conditions to any waiver, including requirements for purchase of commercial liability insurance and maintenance of minimum number of accessible vehicles and limits on the number of new licenses a company can apply for or receive in an 2-year period after it transfers existing licenses.

In November 2008, pursuant to this provision, Barwood submitted a waiver request to the Director of Transportation ("Director"), seeking to transfer an unspecified number of its Fleet PVLs to individuals. The Director, however, advised Barwood that it was required to request a specific number of license transfers, and further that it had to satisfy the waiver criteria, namely that the transfer would have to be shown to "promote sound, safe, reliable customer service, promote public safety, and promote competition." Barwood thereafter submitted a request for a waiver to transfer of up to 250 Fleet PVLs to individuals, supplemented, at the request of the Director, by certain other documents and financial information.

While its request for waiver with the County was pending, Barwood went forward with a hearing on the confirmation of its Reorganization Plan before the Bankruptcy Court. At the hearing, the County objected to the Plan, arguing that it conflicted with MCC § 53-204(d) (the limitation on transfer of Fleet PVLs to individuals), which the County maintained was an appropriate exercise of its police power. On January 15 and 16, 2009, the Bankruptcy Court conducted a hearing on the Plan, at which several witnesses testified and numerous exhibits were received. All outstanding concerns of all other parties involved were resolved except for the

3

County's objection.  At the conclusion of the hearing, the Bankruptcy Judge, ruling from the bench, held that § 1123(a) of the Bankruptcy Code gave the Bankruptcy Court power to preempt the transfer restrictions contained in MCC § 53-204(d), and found that, in this particular case, the transfer restrictions did not directly affect the health, well-being or safety of the community.  The Bankruptcy Court also held that PVLs were the property of Barwood and that its Plan satisfied all the requirements of Bankruptcy Code §§ 1123 and 1129, including the feasibility requirements of § 1129(a)(11).  The Restructuring Plan was therefore confirmed.  This appeal followed.

This Court agrees with the Bankruptcy Court that a reorganization plan under § 1123(a) preempts otherwise applicable nonbankruptcy laws.  It disagrees with the Bankruptcy Court, however, as to the scope of that preemption.  The Court concludes that § 1123(a) does not preempt otherwise applicable nonbankruptcy laws that concern public health, safety, or welfare, and that because MCC § 53-204(d) is such a law, it is not preempted by § 1123(a).

## II.

A district court reviews conclusions of law made by a bankruptcy court *de novo*.  A bankruptcy court's findings of fact are reviewed under the clearly erroneous standard.  Fed. R. Bankr. P. 8013; *see also In re Bryson Properties, XVIII*, 961 F.2d 496, 499 (4th Cir. 1992).  A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## III.

### A.

#### 1.

4

Section 1123(a)(5) of the Bankruptcy Code provides in pertinent part that, "notwithstanding any otherwise applicable nonbankruptcy law a [reorganization] plan shall . . . provide adequate means for the plan's implementation[.]"  When § 1123(a) was originally enacted in 1978, it did not contain the clause "notwithstanding any otherwise applicable nonbankruptcy law," which was added by amendment in 1984.  The "notwithstanding" clause is consistent with other sections of the Bankruptcy Code indicating Congress's intent that "otherwise applicable nonbankruptcy laws" should be preempted.  *See PG&E Co. v. California*, 350 F.3d 932, 946 (9th Cir. 2003) (citing all sections in the Bankruptcy Code that use the "notwithstanding" construction as indicating preemption).  The question before the Court, then, is not whether there is a preemption, but rather its scope – more precisely whether § 1123(a) preempts otherwise applicable nonbankruptcy laws that concern public health, safety, or welfare.

## 2.

The County relies principally on two decisions by the Court of Appeals for the Ninth Circuit, *PG&E Co. v. California*, 350 F.3d 932 (9th Cir. 2003) and *In re Baker & Drake, Inc.*, 35 F.3d 1348 (9th Cir. 1994).

In *In re Baker & Drake*, the court reviewed a reorganization plan that included a proposal to shift control over a taxi service from Baker & Drake, a company operating in Nevada, to individual drivers, even though doing would conflict with state law.  *In re Baker & Drake, Inc.*, 35 F.3d at 1350.  The bankruptcy court approved the plan, but the district court disagreed on the grounds that the statute at issue concerned public health, safety and welfare.  *In re Baker & Drake*, 1992 WL 682764 (D. Nev. Oct. 22, 1992) (holding that the "court finds nothing in the Bankruptcy Code which grants the authority to the bankruptcy court to authorize acts in contravention of a state statute or regulation that is reasonably necessary to protect the public health or safety from identified hazards").  The Ninth Circuit agreed with the district court, holding that preemption

5

under the Bankruptcy Code is less likely "where a state statute is concerned with protecting the public health and safety." *In re Baker & Drake*, 35 F.3d at 1353. In its analysis, the court explained that laws that "[s]imply mak[e] a reorganization more difficult for a particular debtor" are not automatically preempted if they "do[] not rise to the level of 'standing as an obstacle to the accomplishment of the full purposes and objectives of Congress.'" *Id.* at 1354 (noting that "Congress's purpose in enacting the Bankruptcy Act was not to mandate that every company be reorganized at all costs, but rather to establish a preference for reorganization, where they are legally feasible and economically practical") (citations omitted).

In *PG&E*, the County's second principal authority, Pacific Gas & Electric Company ("PG&E"), a large, vertically integrated public utility in California, submitted a voluntary petition under Chapter 11. Among the provisions in its reorganization plan was a proposal to disaggregate the company into four new corporations. The California Public Utilities Commission, the State of California, the City and County of San Francisco, and the California Hydropower Reform Coalition objected, contending that the proposal conflicted with a number of state environmental and health laws and that these laws could not be preempted by § 1123(a)(5). The district court, on interlocutory appeal of the issue of the preemptive scope of § 1123(a), held that the provision expressly preempted all nonbankruptcy laws. The Ninth Circuit reversed. The court considered the preemptive scope of § 1123(a) in conjunction with § 1142(a) of the Code, which states: "Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation *relating to financial condition*, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." (emphasis added). After a lengthy analysis of the legislative history of the two sections, the Ninth Circuit held that the scope of preemption under the "notwithstanding" clause of § 1123(a) was equivalent to the scope of preemption under the "notwithstanding" clause of § 1142(a). *PG&E*,

6

350 F.3d at 937. Reading these clauses together, the court concluded that the scope of preemption under both sections extends only to those otherwise applicable nonbankruptcy laws "relating to financial condition." *Id.* at 948 (noting that "[i]t makes perfect sense that the express preemptive scope of what must be included in a confirmable plan, specified in § 1123(a), would be the same as the express preemptive scope of what is actually included in a confirmed plan, specified in § 1142(a)"). In other words, only applicable nonbankruptcy laws relating to financial condition are preempted by § 1123(a), but not nonbankruptcy laws not relating to financial condition, or at least not laws relating to public health and welfare.

**3.**

Barwood argues that the Court of Appeals for the Fourth Circuit in *In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988) did not limit the scope of § 1123(a)'s preemption to applicable nonbankruptcy laws relating to financial condition. The debtor, FCX, Inc., was an agricultural cooperative association organized under North Carolina law. It was a member, called a patron, of Universal Cooperatives, Inc. ("Universal"), also an agricultural cooperation but organized under Minnesota law, from which it purchased various products. As a creditor of FCX, Universal held certain collateral from FCX – namely unredeemed patronage certificates representing claims for refunds from Universal to which FCX was entitled as a patron of Universal. The bankruptcy court, affirmed by the district court, allowed modification of a Chapter 11 plan authorizing FCX to release the collateral in satisfaction of Universal's claim. It did so over Universal's objections, which argued that its by-laws vested its board with sole and absolute discretion to redeem, or set off, a member's indebtedness against outstanding patronage certificates. The Fourth Circuit affirmed the lower courts, holding that "[b]y its plain language, then § 1123(a)(5)(D) overrides nonbankruptcy law restrictions on the distribution of collateral to satisfy a claim secured by the same." *In re FCX*, 853 F.2d at 1154.

7

Barwood argues that in view of the breadth of this language, the law in the Fourth Circuit is that § 1123(a) preempts *all* otherwise applicable nonbankruptcy laws, regardless of whether the laws were enacted pursuant to a government entity's police power. Barwood lays great stress on the court's statement that "§ 1123(a) is an empowering statute" that "enlarges the scope of [a debtor's] rights. *In re FCX*, 853 F.2d at 1154-55. Thus, says Barwood, Fourth Circuit precedent supports the Bankruptcy Court's holding in this case that § 1123(a) preempts MCC § 53-204(d).

**4.**

The Court agrees with the County's arguments.

It finds Barwood's argument flawed in at least two respects. First and most significantly, no governmental entity was a party in *In re FCX,* and the preemptive scope of § 1123(a) with regard to governmental laws enacted pursuant to the exercise of the police power was not an issue in the case. Second, at footnote 7 in *In re FCX*, the Fourth Circuit wrote: "We do not understand the amendment [which added the "notwithstanding any other non-bankruptcy law" language of § 1123(a)] to have effected a substantive change in the prior law." *In re FCX*, 853 F.2d at 1154 n.7. The clear implication of this statement is that the 1984 addition of the "notwithstanding" clause did not transform or vastly expand the preemptive scope of § 1123(a), a proposition born out by the legislative history of § 1123(a) and of the 1984 amendment. In its extensive review of the "notwithstanding" clause of § 1123(a), in *PG&E Co. v. California*, the Ninth Circuit wrote:

> In 1983, the same proposed amendments to § 1123(a) [including the "notwithstanding clause"] were passed by the Senate as part of S. 445. S. 445, 98th Cong. (1983). When S. 445 was reported out by the Senate Judiciary Committee, the Committee Report stated that the amendments "make technical and stylistic changes." S. Rep. No. 98-65, at 84 (1983). On the floor of the Senate, S. 445 was combined with S. 1013, a bill containing other proposed amendments to the Bankruptcy Code. 129 Cong. Rec. 9968 (1983). The amendments to § 1123 from S. 445 became Subtitle I of S. 1013, entitled "Technical Amendments to Title 11." 129 Cong. Rec. 9986 (1983). Senator Dole, on the Senate floor, described this newly added subtitle as containing provisions designed to "correct grammatical, punctuation, and spelling errors in the code, clarify the intent of the drafters in certain sections, and generally refine procedures." 129 Cong. Rec. 9970 (1983). The

8

>proposed amendments to § 1123 . . . were finally passed by both houses in 1984.  No committee reports were prepared, and the amendments were not mentioned on the floors of the two houses.  The amendments to § 1123 eventually became law in 1984, and were contained in the conference bill in a subtitle headed "miscellaneous Amendments to Title 11."

*PG&E*, 350 F.3d at 938-941.

The propriety of reading *In re FCX* in harmony with *PG&E* is fortified by the Supreme Court's ruling in *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986).  There, the bankruptcy court allowed Midlantic Bank to abandon a toxic waste site as a cost-saving device in connection with its reorganization plan.  The abandonment was authorized pursuant to 11 U.S.C. § 554(a), but directly contravened New Jersey's environmental regulations.   The Court held that the state environmental regulations prevailed, reasoning that if Congress wished to grant such an extraordinary preemption from nonbankruptcy laws, "the intention would be clearly expressed, not left to be collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt."  *Id.* at 501-02.  Significantly, the Court held that the Bankruptcy Act did not preempt "a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards."  *Id.* at 507.  Although *Midlantic* did not directly address the preemptive scope of § 1123(a), it clearly suggests that federal bankruptcy preemption is inappropriate where: (1) a federal, state, or local government law is concerned with protecting public health and safety; and (2) Congress has not clearly expressed its intention to expand provisions of preemption.

Contrary to Barwood's contention, *In re FCX* does not directly address the issue in this case.  Read together, *PG&E*, *In re Baker & Drake*, *Midlantic*, and *In re FCX* establish that § 1123(a) does not preempt otherwise applicable nonbankruptcy laws that are concerned with protecting public health, safety, and welfare.

**B.**

9

That said, the Court turns to MCC § 53-204(d) to determine whether it concerns public health, safety, and welfare. The Bankruptcy Court found, and the parties agree, that taken as a whole, the Montgomery County Code regulating taxicab service was enacted pursuant to the County's police power. The disputed issue is whether MCC § 53-204(d) in particular concerns public health, safety, and welfare. The County maintains that it does; the Bankruptcy Court and Barwood suggest either that it does not or, because it pertains to financial conditions, that it is trumped by the Bankruptcy Code (the latter proposition having just been rejected).

It may be questioned whether individual provisions of a code which, comprehensively speaking, is understood to have been a proper exercise of the police power, may be parsed and separately challenged as enactments that do not involve the police power or, in the context of the present case, that they may be challenged as purely financial arrangements subordinate to the Bankruptcy Code. But in any event, it surely must be so that the individual provisions of a code that, as a whole, is conceded to have been enacted under the police power at least begin with a presumption that they, too, have been enacted under the police power. This has important implications for the way in which a court must view the individual enactment and the issue of who bears the burden of proof when a challenge arises. Here, assuming it is proper to parse the Code and focus on its individual provisions, the Court finds that MCC § 53-204(d) is presumed to be a proper exercise of the police power, which means that Barwood bears the burden of affirmatively and clearly establishing that it is not, or, more precisely, that it is a purely financial arrangement subordinate to the Bankruptcy Code.[1]

---

[1] Barwood emphasizes the fact that it called an expert to testify on the matter before the Bankruptcy Court, whereas the County did not. Given the presumptive police power basis of the County's law, however, there was no need for it to present expert testimony.

In an analogous context, the Maryland Court of Appeals has held that "[t]he wisdom or expediency of a law adopted in the exercise of the police power of a state is not subject to judicial review, and the law will not be held void if there are any considerations relating to the public welfare by which it can be supported." *Bowie Inn, Inc. v. City of Bowie*, 274 Md. 230, 236 (Md. 1975). A party attacking its validity has the burden of affirmatively and clearly establishing its invalidity. *See Governor of Md. v. Exxon Corp.*, 370 A.2d 1102 (Md. 1977) (quoting *Salisbury Beauty Schs, v. State Bd. of Cosmetologists*, 300 A.2d 367 (Md. 1973)). The Court applies these same propositions in the present case.

At the confirmation hearing before the Bankruptcy Court, Barwood presented evidence that it believed demonstrated that MCC § 53-204(d) was not a valid exercise of the County's police power. Rather, they argued, the statute was and is a wholly economic regulation. The Bankruptcy Court agreed with Barwood and held that MCC § 53-204(d) does not "directly affect[] the health or well-being or safety of the community."

Preliminarily one may ponder whether this Court reviews the Bankruptcy's Court's conclusion as a finding of fact (applying the clearly erroneous standard) or as a conclusion of law (determining whether or not it is erroneous). Is it not sufficient, for example, for the County merely to assert, without evidentiary proof but giving logical reasons, why the Code provision in question furthers the public health, safety, and welfare, in effect leading to a review of the issue as a matter of law? Or does the Court, reviewing the record and findings of fact of the Bankruptcy Court, deal with them as true findings of fact subject to the clearly erroneous standard? *See, e.g., Yellow Cab Coop. Ass'n v. Metro Taxi*, 132 F.2d 591, 597 (10th Cir. 1997) ("The bankruptcy court clearly erred in holding that the PUC's action was directed solely at Yellow Cab's property and not to effectuate public policy or public interest.").

But, assuming that the Bankruptcy Court's findings of fact are reviewed under the clearly erroneous standard, and that its holding must be upheld unless the Court, after reviewing the entire evidence before the Bankruptcy Court, is left with the definite and firm conviction that a mistake has been committed, *see Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)), this Court is left with such a conviction. Every indication in the record before the Bankruptcy Court supports the finding that MCC § 53-204(d) was indeed enacted to protect public health, safety, and welfare. *See Yellow Cab Coop. Ass'n*, 132 F.3d at 597 (holding that the bankruptcy court's finding that a reduction in the number of transferred taxi licenses did not address public welfare or safety was clearly erroneous).

Chapter 53 of the Montgomery County Code regulates taxi operation within the County. The Montgomery County Council enacted Chapter 53 as a comprehensive operational structure for the County's taxicab system. The Chapter promotes public health, safety, and welfare by establishing an individual and fleet-based taxicab system and by imposing requirements on drivers and on vehicles, addressing vehicle age, maintenance and repair, equipment, lights, inspections, and limited renewals of licenses. That these controls of the Code are grounded in public policies protecting the health, safety and economic welfare of County citizens can hardly be gainsaid. *See Eastman v. Yellow Cab Co*, 173 F.2d 874, 881 (7th Cir. 1949) ("It must be conceded that the control and regulation of taxicabs used by the public is a valid exercise of the police powers of a city."); *U.S.A. Express Cab, LLC v. City of San Jose*, 2007 WL 4612926 at *8 (N.D. Cal. Dec. 31, 2007) ("As a preliminary matter, regulation of taxicabs is a traditional exercise of a city's police power.").

MCC § 53-204(d), in particular, emphasizes public safety and welfare through the maintenance of the County's fleet-based system. Such a system provides better, safer service to

12

the public than individual drivers for several reasons. The fleet management structure allows greater County control of the quantity and maintenance as well as the evaluation of taxicabs than with individual drivers. Additionally, public safety is promoted through the fleet structure because fleets are more likely to adhere to the reporting requirements relating to accidents. Finally, public welfare is served because the Fleet PVL holders are required to participate in programs that serve the disabled and other special needs of the community. It is unrealistic to conclude other than that, to maintain the many benefits of the fleet system, the County enacted MCC § 53-204(d) to restrict the transferability of Fleet PVLs to individuals. The 80/20 ratio that the County maintains between Fleet and Individual PVLs is a purposeful effort to ensure a centralized taxicab structure and to promote accountability. Whatever the incidental financial implications of the transfer of Fleet PVLs, the County regulation is fundamentally an enactment that furthers public safety and welfare.

The Court concludes that there was insufficient evidence for the Bankruptcy Court to conclude that Barwood's Reorganization Plan did not implicate public health, safety, and welfare.

### IV.

Accordingly, the Court holds that § 1123(a) of the Bankruptcy Code does not preempt governmental laws concerning public health, safety, and welfare, and that MCC § 53-204(d), being such a law, is not preempted. The decision of the Bankruptcy Court is therefore **REVERSED**.

A separate Order will issue.

December 17, 2009

                                                    /s/
                                  PETER J. MESSITTE
                     UNITED STATES DISTRICT JUDGE